Howard M. Shanker (#015547)
THE SHANKER LAW FIRM, PLC.
700 E. Baseline Road, Bldg. B
Tempe, Arizona 85283
Phone: (480) 838-9300
Facsimile: (480) 838-9433
howard@shankerlaw.net

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Protecting Arizona's Resources and Children ("PARC"); The Foothills Community Association; The Foothills Club West Community Association; The Calabrea Homeowners Association; The Lakewood Community Association; The Sierra Club; The Phoenix Mountains Preservation Council ("PMPC"); Don't Waste Arizona ("DWA"); Gila River Alliance for a Clean Environment ("GRACE"), | Case No.: |
| | **COMPLAINT** |
| | (Declaratory and Injunctive Relief) |
| Plaintiffs, | |
| v. | |
| Federal Highway Administration ("FHWA"); Karla Petty, (in her official capacity as the Arizona Division Administrator of the Federal Highway Administration); and the Arizona Department of Transportation ("ADOT"), | |
| Defendants. | |

COMPLAINT

- 1 -

Plaintiffs, by their undersigned attorneys, allege upon personal knowledge, and upon information and belief, as for their Complaint as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are seeking declaratory and injunctive relief for violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 - 4370d ("NEPA"), Section 4(f) of the U.S. Department of Transportation Act of 1966 (49 U.S.C § 303, as amended), Conformity with the Clean Air Act, 23 U.S.C. § 101 and 42 U.S.C. § 7506, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA");

2.      Defendants approved the construction of the Loop 202 South Mountain Freeway.  The Freeway would complete the Loop 202 from I-10 (Maricopa Freeway) (milepost MP 54.31) to I-10 (Papago Freeway) (MP 75.91), a distance of approximately 22 miles, in the southwestern quadrant of the Phoenix metropolitan area;

3.      Defendants' actions in approving the Freeway violated NEPA, Section 4(f) of the Transportation Act and the Conformity Requirements of the Clean Air Act, all of which are actionable under the federal Administrative Procedure Act;

4.      Notwithstanding the myriad significant, negative impacts to the human environment posed by this Freeway, Defendants, *inter alia*, failed to consider: (1) many important aspects of a problem; (2) an adequate range of alternatives; (3) adequate mitigation measures; and (4) significant impacts of the project.  Defendants also failed to adequately respond to comments made by the public, The U.S. EPA, and Plaintiffs' expert consultants;

COMPLAINT                                    - 2 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

5.    Defendants' NEPA/Section 4(f) process was: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . .; or (D) without observance of procedure required by law. . . ."  *See*, 5 U.S.C. § 706(2);

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question); 5 U.S.C. §§ 701-706 (judicial review provisions of the Administrative Procedures Act); and is authorized to provide the relief sought under 28 U.S.C. §§ 2201 and 2202;

7.    Venue in this Court is proper under 28 U.S.C. § 1391(e);

## PARTIES

8.    Each of the below listed plaintiffs have exhausted their administrative remedies by filing, *inter alia*, comments on the Draft and Final Environmental Impact Statements.[1]

9.    Plaintiff, Protecting Arizona's Resources and Children ("PARC") is a not-for-profit corporation organized under the laws of the State of Arizona.  It has over 750 members, the vast majority of whom live and recreate in very close proximity to the Eastern Section of the proposed Freeway.  The primary mandate of PARC is to protect and preserve

---

[1] The Declarations of the following people are attached as an Exhibit to this Complaint for purposes of supporting standing and the likelihood of irreparable harm as set forth in Plaintiffs' Motion for TRO and/or Preliminary Injunction filed contemporaneously herewith: (1) Meg Astudillo; (2) Stephen Brittle; (3) Todd Curry; (4) Mark Coryell; (5) Elizabeth Gagnon; (6) Charley Hepfinger; (7) Patricia Lawlis; (8) John Sanders; and (9) Michael Tashquinth.

COMPLAINT                                    - 3 -

the lifestyle, health, and environment of the Ahwatukee area and on the South Mountains, and to help inform and educate its members and the community by, in part, the dissemination of information on health, environmental, cultural, and environmental justice issues deriving from the development of the South Mountain Freeway.  Members of PARC live near the right-of-way for the Selected Alternative and, in part, use Pecos Road and South Mountain, including the area to be taken for the Freeway, for recreational, aesthetic, educational, religious, and cultural purposes.  PARC and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  PARC's members would have standing to sue on their own behalf, the interests at issue are "germane" to PARC's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of PARC.

10.     Plaintiff, the Foothills Community Association ("FCA") includes about 4,448 households.  The vast majority of its members and their families live, attend school, and/or recreate in very close proximity to the Eastern Section of the proposed Freeway.  About 45% of FCA members live within one-half mile of the proposed right-of-way along Pecos Road.  One of the primary mandates of the FCA is to protect and preserve the lifestyles, recreational/aesthetic opportunities, and the health and wellbeing of its members, all of whom are directly impacted by the proposed Freeway.   The FCA is also committed to protecting its common areas and the members' utilization of such areas, as well as members' property values.  The FCA's role also includes helping to inform and educate its members

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

by, in part, the dissemination of information on health, environmental, cultural, social, traffic and economic issues deriving from the development of the South Mountain Freeway. Members of the FCA live near the right-of-way for the Selected Alternative and, in part, use Pecos Road and South Mountain, including the area to be taken for the Freeway, for recreational, aesthetic, educational, religious, and cultural purposes.  The FCA and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  The FCA has members that would have standing to sue on their own behalf, the interests at issue are "germane" to the FCA's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of the FCA;

11.     Plaintiff, the Foothills Club West Community Association ("FCWCA") is a homeowners association organized under the laws of the State of Arizona.  There are over 2400 households that are currently members of the FCWCA, with an additional approximately 100 more households that will be members in the near future.  The vast majority of its members and their families live, attend school, and/or recreate in very close proximity to the Eastern Section of the proposed Freeway.  Between 25% to 35% of FCWCA members live either south of Liberty Lane, adjacent to the Pecos Road take-zone, or less than 1500 feet north of Liberty Lane.  One of the primary mandates of the FCWCA is to protect and preserve the lifestyles, recreational/aesthetic opportunities, and the health and wellbeing of its members, all of which are directly impacted by the proposed Freeway.   The FCWCA is also committed to protecting its common areas and the members' utilization of

COMPLAINT

- 5 -

such areas, as well as members' property values.  The FCWCA's role also includes helping

to inform and educate its members by, in part, the dissemination of information on health,

environmental, cultural, social, traffic and economic issues deriving from the development of

the South Mountain Freeway.  Members of the FCWCA live near the right-of-way for the

Selected Alternative and, in part, use Pecos Road and South Mountain, including the area to

be taken for the Freeway, for recreational, aesthetic, educational, religious, and cultural

purposes.  The FCWCA and its members seek to preserve the environmental, recreational,

cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to

turn into a Freeway.  The FCWCA has members that would have standing to sue on their

own behalf, the interests at issue are "germane" to the FCWCA's mission, and neither the

substantive claims nor the remedy sought necessitates the participation of any individual

member of the FCWCA;

12.     Plaintiff, the Calabrea Homeowners Association ("CHOA") is a homeowners

association organized under the laws of the State of Arizona.  There are approximately 94

households that are currently members of the CHOA.  The vast majority of its members and

their families live, attend school, and/or recreate in very close proximity to the Eastern

Section of the proposed Freeway.  About 75% on CHOA's members live within one-half

mile of the proposed right-of-way for the Eastern Alignment of the Freeway.  One of the

primary mandates of the CHOA is to protect and preserve the lifestyles,

recreational/aesthetic opportunities, and the health and wellbeing of its members, all of

which are directly impacted by the proposed Freeway.   The CHOA is also committed to

COMPLAINT                                    - 6 -

protecting its common areas and the members' utilization of such areas, as well as members' property values.  The CHOA's role also includes helping to inform and educate its members by, in part, the dissemination of information on health, environmental, cultural, social, traffic and economic issues deriving from the development of the South Mountain Freeway. Members of the CHOA live near the right-of-way for the Selected Alternative and, in part, use Pecos Road and South Mountain, including the area to be taken for the Freeway, for recreational, aesthetic, educational, religious, and cultural purposes.  The CHOA and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  The CHOA has members that would have standing to sue on their own behalf, the interests at issue are "germane" to the CHOA's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of the CHOA;

13.     Plaintiff, the Lakewood Community Association ("LCA") is a homeowners association organized under the laws of the State of Arizona.  LCA had approximately 2,800 members, consisting of single family homes, condominiums, and apartments.  The vast majority of its members and their families live, attend school, and/or recreate in very close proximity to the Eastern Section of the proposed Freeway.  About 1,075 members/single family homes are located within one-half mile of Pecos Road. i.e., the proposed right-of-way for the Eastern Alignment of the Freeway.  One of the primary mandates of the LCA is to protect and preserve the lifestyles, recreational/aesthetic opportunities, and the health and wellbeing of its members, all of which are directly impacted by the proposed Freeway.   The

COMPLAINT                                            - 7 -

LCA is also committed to protecting its common areas (including its lakes that would be impacted by the Freeway) and the members' utilization of such areas, as well as members' property values.  The LCA's role also includes helping to inform and educate its members by, in part, the dissemination of information on health, environmental, cultural, social, traffic and economic issues deriving from the development of the South Mountain Freeway. Members of the LCA live near the right-of-way for the Selected Alternative and, in part, use Pecos Road and South Mountain, including the area to be taken for the Freeway, for recreational, aesthetic, educational, religious, and cultural purposes.  The LCA and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  The LCA has members that would have standing to sue on their own behalf, the interests at issue are "germane" to the LCA's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of the LCA;

14.     Plaintiff, Sierra Club is a national nonprofit organization with 64 chapters and over 650,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; and to educating and enlisting humanity to protect and restore the quality of the natural and human environments.  Sierra Club members have a significant interest in and are directly affected by the proposed South Mountain Freeway and its impacts on air quality, public health, native plants and animals, South Mountain park, and other natural resources. Many Sierra Club members enjoy watching wildlife, hiking, and other outdoor and

COMPLAINT                                    - 8 -

educational activities on the lands affected by this proposed project and are affected by the negative air quality impacts of the proposed freeway.  Sierra Club has been involved in the Citizen Advisory Group and various processes over the years relating to both the freeway and to South Mountain Park, as well as transportation planning overall.  Sierra Club has more than 35,000 members and online supporters in Arizona and is involved, in part, in the dissemination of information to its members and the public on health, environmental, cultural, and environmental justice issues deriving from the development of the South Mountain Freeway.  The Sierra Club and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  Sierra Club's members would have standing to sue on their own behalf, the interests at issue are "germane" to the Sierra Club's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of the Sierra Club;

15.     Plaintiff, Phoenix Mountains Preservation Council ("PMPC") is a not-for-profit organization organized under the laws of the State of Arizona.  PMPC's mission is to preserve, protect, monitor, advocate, and educate the public and its members for and about the Phoenix's Mountain Preserve system.  The South Mountain Park/Preserve, including the area directly impacted by the proposed Freeway, is an integral part of this system.  PMPC members live near the Pecos Road alignment.  PMPC members also use the South Mountain Park/Preserve including the areas directly impacted by the proposed Freeway for recreational purposes including, hiking, biking, and horseback riding.  PMPC members use this area to

COMPLAINT                                        - 9 -

enjoy/experience Sonoran Desert views/aesthetics, to meditate/reflect and to study flora and fauna.  According to PMPC, "the Freeway will destroy significant aspects of this natural resource.  It will disrupt and destroy the plants and wildlife as well as the visual/aesthetic and tranquil recreation experience of its members and the public that PMPC is directed to protect."  PMPC and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to turn into a Freeway.  PMPC's members would have standing to sue on their own behalf, the interests at issue are "germane" to PMPC's mission, and neither the substantive claims nor the remedy sought necessitates the participation of any individual member of PMPC;

16.     Plaintiff, Don't Waste Arizona ("DWA") is a not-for-profit organization organized under the laws of the State of Arizona.  DWA's mission/directive is the "protection, conservation, and preservation of the human and natural environment in and around Phoenix, and the State of Arizona."  This mission is, in part, achieved through community organizing, advocacy, and the dissemination of information to its members and the public on health, environmental, cultural, and environmental justice issues deriving from the development of the South Mountain Freeway.  DWA members live near the Pecos Road alignment.  These members will have their health, lifestyles, views and recreational opportunities directly, negatively impacted by the Freeway.  DWA members use the South Mountain Park/Preserve including the areas directly impacted by the proposed Freeway for recreational, cultural, religious, and educational purposes.  DWA and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

of the land the Defendants are proposing to turn into a Freeway.  DWA's members would

have standing to sue on their own behalf, the interests at issue are "germane" to DWA's

mission, and neither the substantive claims nor the remedy sought necessitates the

participation of any individual member of DWA;

17.     Plaintiff, Gila River Alliance for a Clean Environment ("GRACE") is a grass

roots organization that was created about 13 years ago by members of the Gila River Indian

Community to identify, educate, and address environmental and environmental justice issues

impacting the Gila River Indian Community.  GRACE has been educating people on the

environmental, health, and environmental justice impacts of the proposed Freeway.

GRACE's mission is, in part, achieved through community organizing, advocacy, and the

dissemination of information to its members and the public on the health, environmental,

cultural, and environmental justice issues deriving from the development of the South

Mountain Freeway.  GRACE members use the South Mountain Park/Preserve including the

areas directly impacted by the proposed Freeway for cultural, religious, and educational

purposes.  South Mountain Park/Preserve, including the area impacted by the proposed

Freeway, is sacred to GRACE's members.  GRACE has members who hike and use areas of

the South Mountains and Pecos Road for recreational, educational, and aesthetic purposes,

all of which will be impacted by the proposed Freeway.  GRACE has members who live near

the proposed Eastern Alignment whose lifestyles, views, and health will be directly impacted

by the Freeway.  GRACE and its members seek to preserve the environmental, recreational,

cultural, and historic integrity and aesthetic value of the land the Defendants are proposing to

COMPLAINT                                      - 11 -

turn into a Freeway.  GRACE's members would have standing to sue on their own behalf,

the interests at issue are "germane" to GRACE's mission, and neither the substantive claims

nor the remedy sought necessitates the participation of any individual member of GRACE;

18.     Defendant, Federal Highway Administration ("FHWA"), is an agency of the

United States government, within the U.S. Department of Transportation. The FHWA is the

lead federal agency for the proposed Freeway.  The FHWA has ultimate

responsibility/authority for approval of the NEPA/Section 4(f) process at issue herein;

19.     Defendant, Karla Petty, is named in her official capacity as the Arizona

Division Administrator of the Federal Highway Administration;

20.     The Arizona Department of Transportation ("ADOT") is the project sponsor

and is the State agency responsible for State level compliance;

## ALLEGATIONS COMMON TO ALL COUNTS

21.     "The location of the Freeway was formally adopted by the Arizona Department

of Transportation ("ADOT") and the Maricopa County Association of Governments

("MAG") in 1988 and 1989."  FEIS at S-41; *see, also, e.g*., FEIS at 1-5 ("The general

location for the South Mountain Freeway has remained unchanged since 1985.") –

approximately 30 years before the approval of the Record of Decision/Section 4(f)

Determination;

22.     NEPA requires that a federal agency contemplating action "consider every

significant aspect of the environmental impact" of the proposed action, and "inform the

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

public that it has indeed considered environmental concerns in its decision-making process."

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also* 42

U.S.C. § 4331; *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)

(Compliance with NEPA ensures that federal agencies will consider significant

environmental impacts of federal action, make available the relevant information , and open

to public scrutiny their decision making.);

23.    NEPA's purpose is to ensure that federal agencies take a "hard look" at

environmental consequences before committing to action.  *Robertson v. Methow Valley*

*Citizens Council,* 490 U.S. 332, 350 (1989). In order to take a "hard look," Defendants must,

*inter alia*, "[f]ully consider the impacts of [its proposal] on the physical, biological, social,

and economic impacts of the human environment."  40 C.F.R. § 1508.14.   "If an agency

fails to consider an important aspect of a problem . . . its action is arbitrary and capricious."

*Oregon Natural Resources Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007);

24.    The Eastern Section/Alignment ("E1") of the proposed Freeway would begin

at its eastern terminus with the existing system traffic interchange between I-10 (Maricopa

Freeway) and Loop 202 (Santan Freeway).  From there, it would travel westward on the

Pecos Road alignment for approximately 8 miles before heading northwest for

approximately 5 miles to a point near the existing Elliot Road and 59th Avenue intersection.

The identified location at Elliot Road and 59th Avenue is the "point common to all

alternatives" because it is the location where each of the three alternatives considered for the

Western Section of the Freeway would meet up with the Eastern Section;

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

25.     The Eastern Alignment would result in the destruction of parts of three ridges of the South Mountains – two of which are in the Phoenix South Mountain Park/Preserve (FEIS at 5-14 & 5-19, Figure 5-11), bisect historic recreation trails, undermine the historic integrity of the South Mountain Park, and disturb the tranquility and the ability to quietly enjoy the area, harm wildlife and biological resources and wildlife and plant corridors, adversely impact significant views and aesthetic values of the Park and degrade desert ecosystems, including washes and drainage-ways;

26.     The Eastern Alignment will directly take approximately 31.3 acres of South Mountain Park but "use" significantly more acreage than that.  *See, Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir. 1982) (Under 4(f) of the Transportation Act, "use" is construed broadly, applying not only to areas physically taken, "but also to those significantly adversely affected by the project."); *See, also*, FEIS at 5-12 (Figure 5-7);

27.     South Mountain Park is one of the largest municipally operated parks in the world.  It has been called the "centerpiece" of the Phoenix Sonoran Preserve System.  FEIS at 5-14.  Both the Phoenix Historic Preservation Office and the State Historic Preservation Officer agree that South Mountain Park is eligible for listing on the National Historic Register of Historic Places under Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470, *et seq*.;

28.     South Mountain is also a Traditional Cultural Property that is sacred to, in part, the Pima/Akimel O'odham people, including members of the Gila River Indian Community (the "Community").  *See*, *e.g.,* Record of Decision ("ROD") at 36;

COMPLAINT                                          - 14 -

29.     Pecos Road (the Eastern Section), which currently runs between the southern edge of Ahwatukee and the northern border of the Community, currently accommodates about 25,000 vehicles per day.  *See*, FEIS at 1-15 (Figure 1-8).  It is primarily used for residential and related purposes by people living in the Ahwatukee area.  Pecos Road dead-ends at around 27th Avenue.  Pecos Road is also currently a destination for cyclists and cycling events – including the Arizona Senior Olympics;

30.     With the proposed Freeway in place, that same corridor would be used by between 125,000 to 140,000 vehicles per day, depending on location, many of which will be trucks, resulting in an approximately 460% increase in traffic along the Pecos Road corridor, on a daily basis.  *See, Id.*

31.     The significant impacts resulting, in part, from this increased volume of traffic, including but not limited to impacts on health, noise, aesthetics, recreation, and quality of life, were not adequately discussed, analyzed, or mitigated in Defendants' NEPA documents;

32.     Notwithstanding the obligation under NEPA and Section 4(f) of the Transportation Act to consider a range of alternatives, some of which would avoid impacts to South Mountain, Defendants considered no action alternatives – other than the Selected Alternative – for the Eastern Section of the Freeway;

33.  From the "point common to all alternatives," the Western Section of the Freeway would head northward for approximately 9 miles, crossing the Salt River, and reach its western terminus at a new system traffic interchange with I-10 (Papago Freeway) near 59th Avenue. FEIS at S-1; ROD at 16-17;

COMPLAINT

- 15 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

34.     There are over 50 bridge sites (approximately 77 bridges) along the Freeway corridor.  Notable bridges include the Salt River Bridge, which is over 3,000 feet long, multiple bridges over the Union Pacific Railroad, and the flyover ramps at I-10 (Papago Freeway;

35.     The Freeway will displace approximately 848 housing units, including 680 multifamily units and 168 single family residences.  FEIS at 4-46 (Table 4-13);

36.     There are approximately 17 schools within one-half mile of the selected right-of-way resulting in significantly increased health risks to children attending those schools (over 15,000 children on a daily basis) and/or living in proximity to the freeway;

37.     Notwithstanding the myriad negative impacts associated with the Selected Alternative, "there will be capacity deficiencies at levels comparable to the No Action Alternative on freeways and arterials throughout the Metropolitan Area and on the South Mountain Freeway itself" at full build out.  FEIS Vol. II at B446; *see, also, e.g*., FEIS at 3-34 (Table 3-8);

**Defendants' NEPA Process**

38.     Defendants finalized the Draft Environmental Impact Statement and Section 4(f) Evaluation ("DEIS") on April 16, 2013.  A notice of its availability was published in the *Federal Register* on April 26, 2013.  This established the public comment period for the document. FEIS at xi;

39.     The DEIS was 1108 pages including the main text and appendices;

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

40.     At the same time as the DEIS publication, a "study team" submitted the Initial Location/Design Concept Report (L/DCR) to ADOT.  The design plans included in the Initial L/DCR represented approximately 15%-level design plans for the Freeway.  The Final L/DCR was going to be made available to the public sometime after the issuance of the ROD;

41.     Neither the Initial L/DCR nor the fact that the Freeway had only been conceptualized to an approximately 15%-level of design were made public/discussed in Defendants' DEIS.  This also was not discussed in the FEIS or the ROD;

42.     With such a low level of design in place it is impossible to adequately analyze impacts and/or to discuss mitigation measures – which explains why much of this discussion included in the NEPA documents is improperly put off until the design/or construction phase of the project;

43.     Instead of the range of action alternatives mandated by NEPA, the DEIS considered only one Action Alternative in detail for the Eastern Alignment – the Selected Alternative;

44.     The DEIS considered three similar Action Alternatives for the Western Section, all of which consisted of a Freeway in the Study Area that connected to the Eastern Section at or near Elliot Road and 59th Avenue;

45.     The DEIS recommended implementation of the Preferred/Selected Alternative;

46.     A significant number of comments were submitted in Response to the DEIS;

COMPLAINT                                    - 17 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

47.     The U.S. Environmental Protection Agency ("EPA"), for example, reviewed

the DEIS and found, in part, that:

> [b]ased upon this lack of information important to analyzing the project's
> potentially significant impacts on air quality, EPA has rated the South
> Mountain Freeway DEIS as "3- Inadequate Information." . . . EPA believes the
> following information would serve as the basis for a robust and meaningful air
> quality analysis: (1) Assessment and disclosure of potential PM10 hotspot
> impacts and confirmation of whether the project meets the Clean Air Act's
> transportation conformity requirements; (2) Emissions analyses that present the
> emissions of the South Mountain Freeway corridor separate from those of I-10,
> along with updated traffic forecasting for the No Action alternative; and (3) a
> robust air toxics risk assessment that addresses potential health effects from the
> proposed new freeway . . We recommend this information be circulated in a
> Supplemental DEIS for public comment  . . .

FEIS Vol. III at B7;

48.     The Category 3 (Inadequate Information) rating is the lowest rating EPA gives

a draft EIS.  According to the EPA, it means that:

> EPA does not believe that the draft EIS adequately assesses potentially
> significant environmental impacts of the action . . . EPA believes that the
> identified additional information, data, analyses, or discussions are of such
> magnitude that they should have full public review at a draft stage.  EPA does
> not believe that the draft EIS is adequate for the purpose of NEPA and/or
> Section 309 review, and thus should be formally revised and made available
> for public comment in a supplemental or revised draft EIS . . .

FEIS Vol. III at B9;

49.     Plaintiffs submitted hundreds of pages of expert commentary that was critical

of the discussion and findings set forth in the DEIS – the vast majority of these comments

were not properly addressed by Defendants and/or properly reflected in the FEIS/ROD.  *See*,

FEIS Vol. III at B312 - B690; ROD Vol. II at A101- A321;

COMPLAINT                                    - 18 -

50.     For example, in comments to the DEIS, Plaintiffs' demographics expert pointed out, *inter alia*, that ADOT had relied on outdated 2005 census data to justify population growth projections ("purpose and need") for the project – even though 2010 census data was readily available.  *See, e.g*., ROD VOL. II at A212-A215.

51.     2005 census data improperly showed inflated population growth projections throughout the region – it was generated before the recession and burst of the housing bubble.  2010 census data reflected an approximate 20% decrease in projected growth rates;

52.     The Final Environmental Impact Statement/Section 4(f) Evaluation ("FEIS") was approved on or about September 18, 2014;

53.     The FEIS consisted of three volumes: Volume I was 454 pages consisting of the main text; Volume II was 950 pages consisting of letters and appendices of documents; and Volume III was 3,890 pages consisting of DEIS comments and responses;

54.     The FEIS, again, selected the Preferred/Selected Alternative;

55.     With regard, for example, to the concerns raised by EPA on the DEIS, the FEIS provided that, "[n]o modifications to the Preferred Alternative have occurred since the DEIS was published.  Because the corrections and updated information incorporated in the FEIS did not reveal any significant adverse environmental impacts not previously considered in the DEIS, a Supplemental DEIS is not needed."  FEIS at xi;

56.     In its comment on the FEIS, the EPA made clear that the FEIS remained deficient.  For example, according to the EPA, in part:

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

we have continuing concerns regarding the analysis and discussion provided in the Final EIS regarding possible near-roadway health impacts along the proposed new freeway corridor, including impacts to children and sensitive receptors.  Additionally, we have continuing concerns with the analysis of the No Action Alternative, as well as impacts to both aquatic resources and wildlife connectivity. . . .

ROD Vol. II at A6-A7.

57.     "[T]he apparently unanswered concern of a sister agency. . . weighs as a factor pointing toward the inadequacy of the EIS."  *League of Wilderness Defenders/Blue Mountains Biodiversity v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002); *Sierra Club v. U.S. Army Corps*, 701 F.2d 101, 1030 (2d Cir. 1983) ("court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.");

58.     Defendants subsequently plugged the 2010 census data into the FEIS, which showed significantly slower growth than projected in the DEIS, but reached identical conclusions.  According to the FEIS, "[t]he new socioeconomic and traffic projections, while generally lower than what was previously predicted, validated the overall conclusions of the DEIS in terms of purpose and need. . ."  FEIS at xi;

59.     As Plaintiffs' demographics expert pointed out:

[t]he only difference between the DEIS and the FEIS is that the reduced figures have now been "plugged in" to Figure 1-7 and the text on page 1-11.  The fact that a nearly 20% decrease in projected 2035 values has no bearing on conclusions regarding the proposed action suggests that decisions regarding the proposed action were made irrespective of population and employment projections. . .

ROD Vol. II at A213;

COMPLAINT                                                     - 20 -

60.     Plaintiffs submitted hundreds of pages of expert commentary on both the DEIS and the FEIS – essentially none of which was either properly addressed and/or reflected in the FEIS/ROD.  *See*, FEIS Vol. III at B312 - B690; ROD Vol. II at A101- A321;

61.     Defendants not only ignored the EPA's request for multiple corrections, which, if appropriately addressed, would have called for the issuance of a Supplemental DEIS, they manipulated data to their own ends and precluded the requisite public review and comment on essential information;

62.     The Record of Decision/Section 4(f) Determination ("ROD"), adopting and approving the analysis and selection of alternatives set forth in the DEIS and again in the FEIS, was approved on or about March 5, 2015;

63.     The ROD consisted of three volumes: Volume I was 82 pages consisting of the main text; Volume II was 810 pages consisting of FEIS comments and responses; and Volume III was178 pages consisting of supporting documents;

## COUNT 1

### (VIOLATION OF NEPA)
### The FEIS Justifies a Decision Already Made Outside of the Context of the NEPA Process

64.      Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

65.     A NEPA analysis must "be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000);

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

66.     "The location of the freeway was formally adopted by the Arizona Department of Transportation ("ADOT") and the Maricopa County Association of Government ("MAG") in 1988 and 1989."  FEIS at S-41; *see, also, e.g*., FEIS at 1-5 ("The general location for the South Mountain Freeway has remained unchanged since 1985.").;

67.     According to Defendants:

ADOT began acquiring land for the original alignment R/W in 1988.  Between 1988 and 2001, ADOT acquired approximately 293 acres.  Most of this land (258 acres) is located in the Eastern Section along Pecos Road.  In 2006, ADOT began . . . land acquisition in the alignment R/W footprint for the W59 and EI alternatives.  Between 2006 and October 2013, ADOT purchased 326 acres (303 in the Western Section and 23 in the Eastern Section).

FEIS at 3-53;  *see, also, e.g.,* FEIS at 3-36 to 3-37 ("development, zoning, and residential and commercial location determinations in the past several years have been made assuming a 'South Mountain Freeway' generally near the 1988 alignment.");

68.     Defendants admit that the system traffic interchange at the eastern terminus "was constructed in 2000-2002 to accommodate the western leg of SR 202L – the proposed action."  FEIS at 3-50.  They also admit that "ADOT recently (well before the issuance of the ROD) completed construction of a direct HOV connection" in anticipation of connecting with the proposed Freeway.  FEIS at 3-50;

69.     Further, according to Defendants:

[t]he RTP-planned improvements for the Regional Freeway and Highway System assumed that a freeway would be located in the Study area in the foreseeable future.  If a freeway were not built to provide this capacity future traffic distributions and volumes would vary from those used to plan and design other major facilities. . .

FEIS at 3-35;

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

70.     Defendants admit that only the Selected Alternative for the Eastern Section was even put forth for detailed consideration in the NEPA documents.  That is, according to Defendants, "[g]eographic and jurisdictional constraints narrowed consideration of action alternatives in the Eastern Section of the Study Area."  FEIS at 3-8;

71.     ADOT has even had a sign posted at 24th Street and Pecos for over a decade identifying Pecos Road as the future right-of-way for the SMF;

72.     ADOT considered three very similar action alternatives for the Western Alignment but "selected" the action alternative along 59th Avenue, that was consistent with ADOT's pattern of historic land purchases and ADOT/MAG's long-term planning;

73.     Each of the action alternatives for the Western Alignment consisted of a freeway within the Study Area that would "connect with the E1 Alternative at the point common to all action alternatives."  ROD at 16-17;

74.     In October, 2014, ADOT put out a Request for Qualifications for a Public Private Partnership Design-Build-Maintain Contract to design/build/maintain the Freeway. Ex. 1. The ROD was not issued until March, 2015;

75.     In pertinent part, the Procurement Schedule set forth in the Request for Qualifications provides; (1) Issue RFQ October 15, 2014; (2) Final date for receipt of Proposer's questions, November 6, 2014; (3) SOQ Due Date, December 10, 2014; Anticipated issuance of ROD, Mid January 2015; (4) Anticipated shortlisting notification, Late January 2015 . . . ;

COMPLAINT

- 23 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

76.     In addition to Defendants' own admissions, this is further indication that Defendants predetermined the outcome of the NEPA process;

77.     Identification and approval of the Eastern Section of the Freeway was determined before the NEPA process was completed.  On this basis alone, agency action was arbitrary, capricious, and/or not in accordance with law;

78.     Identification and approval of the Western Section of the Freeway was determined before the NEPA process was completed.  As a result, agency action was arbitrary, capricious, and/or not in accordance with law;

79.     The instant NEPA process was no more than a "subterfuge designed to rationalize a decision already made";

## COUNT 2

### (VIOLATION OF NEPA)

**The Possible Location of the Freeway was Limited to a "Study Area" that was Designated Outside of the NEPA Process**

80.     Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

81.     Applicable regulations provide, *inter alia*, that:

NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.

40 C.F.R. § 1500.1(b);

COMPLAINT                                          - 24 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

82.     In the instant case, one of the most significant aspects of the project – where to put an eight-lane freeway – was withheld from the NEPA decision-making process;

83.     The selection/delineation of the "Study Area" was not part of the NEPA process.  *E.g.*, FEIS at 1-8 ("The need for a major transportation facility in the Study Area was first identified in the 1983 Southwest Area Transportation Study.");

84.     Designating the "Study Area" outside of the NEPA process was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.  *South Fork Band Council of Westerns Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (citations omitted) ("A non-NEPA document – let alone one prepared and adopted by a state government – cannot satisfy a federal agency's obligations under NEPA."); *Metcalf*, 214 F.3d at 1145, *citing* 40 C.F.R. §§ 1501.2, 1502.5 ("NEPA's effectiveness depends entirely on involving environmental considerations in the initial decision-making process.");

## **COUNT 3**

### **(VIOLATION OF NEPA)**
**The "Purpose and Need" Statement for the Project was Impermissibly Restrictive**

85.     Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

86.     "An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action and the EIS would become a foreordained formality." *League of Wilderness Defenders – Blue Mountains Biodiversity Project v. U.S. Forest Service*, 689 F.3d 1060,

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

1068 (9th 2012);  *City of Carmel By-The-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (An "agency cannot define its objectives in unreasonably narrow terms to restrict the range of reasonable alternatives."); *Alaska Survival v. Surface Transp. Bd.,* 705 F.3d 1073, 1084 (9th Cir.2013) ("A purpose and need statement will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained.");

87.     The Statement of Purpose and Need of Defendants' NEPA documents, outlines regional transportation needs that appear reasonable.  It also, however, requires the construction of a "major transportation facility" in the "Study Area" as the only responsive option.  According to the FEIS, "[w]ithout a major transportation facility in the Study Area, the region's transportation network will suffer. . ."  FEIS at 1-21;

88.     Defendants admit that, "[g]eographic and jurisdictional constraints narrowed consideration of action alternatives in the Eastern Section of the Study Area."  FEIS at 3-8;

89.     As a result, the Pecos Road alignment (Eastern Section) was the only area that would accommodate the only Action Alternative considered in detail in the NEPA documents.  No other "action alternatives" were considered for the Eastern Section, let alone any sort of "range of action alternatives" as mandated by NEPA;

90.     "The evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action . . .  an agency cannot restrict its analysis to those alternative means by which a particular applicant can reach his goals . . ."  *Simmons v. U.S. Army Corps*, 120 F.3d 664, 669 (7th Cir. 1997); *Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002) (". . . such a narrow definition of Project needs would

COMPLAINT                                    - 26 -

violate NEPA given the more general overarching objective of improving traffic flow in the area.").  In the instant case, the general goal for the project is to meet regional traffic demand – not to build a freeway in the Study Area

91.     The requirement that a "major transportation facility" be constructed within the arbitrarily identified "Study Area," defines the agency's "objectives in unreasonably narrow terms [so as] to restrict the range of reasonable alternatives."  *City of Carmel By-The-Sea*, 123 F.3d at 1155.  As a result, agency action was arbitrary, capricious, and/or otherwise not in accordance with law;

## COUNT 4

### (VIOLATION OF NEPA)
### Defendants Failed to Consider an Adequate Range of Alternatives

92.     Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

93.     An EIS must include a "detailed statement of alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); *see, also, e.g.*, 40 C.F.R. § 1502.1 (EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.");

94.     NEPA regulations describe the alternatives analysis as "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.  The agency is obligated to look at every reasonable alternative within the range dictated by the nature and scope of the proposal.  The existence of a reasonable but unexamined alternative renders an EIS

COMPLAINT                                          - 27 -

inadequate.  *E.g., Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998);

95.     Defendants included only one action alternative for consideration in the Eastern Section.  On this basis alone, agency action was arbitrary, capricious, and/or an abuse of discretion;

96.     Defendants considered only three similar alignments for the Western Section – all of which consisted of a freeway in the Study Area that would meet up with the (predetermined) Eastern Section at around Elliot Road and 59th Avenue;

97.     Defendants refused to consider any alternatives that would otherwise meet regional transportation needs that did not consist of the Freeway, or, at best, a freeway within the Study Area.  Defendants' actions were arbitrary, capricious, and/or an abuse of discretion;

98.     Plaintiffs, and others, submitted a significant number of reasonable alternatives for consideration during the NEPA process that should have been considered in the FEIS;

99.     Defendants failed to adequately consider numerous reasonable alternatives that would have achieved the generalized purpose and need for the project but which did not consist of a "Freeway" within the "Study Area;"

100.    The existence of a reasonable but unexamined alternative renders an EIS inadequate.  *E.g., Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998);

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

## <u>COUNT 5</u>

### (VIOLATION OF NEPA)
### Defendants' Consideration of the "No Action" Alternative was Legally Deficient

101.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

102.    The reviewing agency is obligated to provide a thorough analysis of the "no action" alternative.  40 C.F.R. 1502.14(d); *Bob Marshall Alliance*, 852 F.2d at 1228 ("Informed and meaningful consideration of alternatives – including the no action alternative – is . . . an integral part of the statutory scheme.");

103.    In the instant case, Defendants relied on socioeconomic projections generated by MAG for all of its modeling.  *E.g*., FEIS at 3-27.   Although this is not (as it should have been) made clear in the FEIS, MAG provided ADOT with only one model;

104.    MAG ran their socioeconomic model to project land-use, employment and population, assuming all projects included in their regional plan including the South Mountain Freeway – irrespective of whether the projects have passed NEPA review;

105.    In other words, Defendants utilized a socioeconomic/demographic model to analyze the impacts of the No Action Alternative that assumed construction of the Freeway. As a result, Defendants impermissibly provided flawed data that presented no possibility of an accurate baseline for purposes of comparison;

106.    As the EPA pointed out:

[i]n our comment letter on the Draft EIS, EPA noted the need to analyze the
No Action Alternative using updated socioeconomic projections that do not

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

assume completion of the South Mountain Freeway.  In the Final EIS, there continues to be a lack of analysis regarding the projected differences in land use and emissions if no freeway were to be built. . . we continue to recommend that the likely differences in land use, emissions, and congestion impacts between the Action and No Action alternatives be fully disclosed.  Methods exist to complete these types of projections and "scenarios planning" . . . The "No Action" scenario includes population and employment projections that assume the "Preferred Alternative" is built  . . .

ROD Vol. II, at A10;

107.    Plaintiffs similarly pointed out this significant flaw in Defendants' NEPA review.  ROD Vol. II at  A228 ("ADOT failed to include a no-build land use, population and employment projection in its analysis of the no-build travel scenario.");

108.    This is a violation of NEPA.  "The baseline alternative should not have assumed the existence of the very plan being proposed . . . A no action alternative in an EIS is meaningless if it assumes the existence of the very plan being proposed." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 1037-1038 (9th Cir. 2008); *see, also, e.g., Sierra Club, Illinois Chapter v. U.S. Dept. of Transp.*, 962 F.Supp. 1037, 1043-1044 (N.D. Ill. 1997)

(. . . the final impact statement contains a socioeconomic forecast that assumes the construction of a highway such as the tollroad and then applies that forecast to both the build and no-build alternatives. . . Accordingly, the final impact statement does not adequately justify its reliance on projected needs and thus fails to observe procedures required by law.  5 U.S.C. 706(2)(D).  Moreover, FHWA's decision, which does not require defendants to produce an appropriate socioeconomic forecast or to explain adequately why such a forecast is not possible was arbitrary and capricious.  5 U.S.C. 706(2)(A)).

109.    In addition to using the wrong model, Defendants failed to identify the limitations of the model it used.  They also failed to make that information available to the

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

public.  Indeed, the model itself was neither readily available to and/or understandable by the public.  The failure to make this information available to the public and/or to provide some explanation as to why it was not available is another, independent, violation of the agency obligation to, *inter alia*, ensure that high quality environmental information is available to public officials and citizens before decisions are made and before actions are taken. 40 C.F.R. § 1500.1(b);

## **COUNT 6**

### **(VIOLATION OF SECTION 4(F)(1) OF THE TRANSPORTATION ACT)**

### **Defendants Failed to Adequately Consider "Avoidance Alternatives"**

110.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

111.    Section 4(f) of the Department of Transportation Act mandates that:

[t]he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public part, recreation area, or wildlife and waterfowl refuge of national, State, or local significance . . . or any land from an historic site of national, State, or local significance . . . unless:  (1) there is no feasible and prudent alternative to the use of such land; and (2) such program includes all possible planning to minimize harm to such park, recreational area . . . or historic site resulting from the use.

49 U.S.C. § 1653(f);

112.    Unlike NEPA which is widely viewed as a procedural statute, Section 4(f) imposes substantive restraints on an agency's action.  *North Idaho Community Action Network v. U.S. Dep't of Transp.*, 545 F.3d, 1147, 1158 (9th Cir. 2008);

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B ▪ TEMPE, AZ 85283
TELEPHONE (480) 838-9300 ▪ FACSIMILE (480) 838-9433
howard@shankerlaw.net

113.    Defendants considered no alternatives to the Eastern Alignment – that runs through South Mountain – Defendants found in the ROD that "[a]voidance of the South Mountains is not prudent and feasible because," in pertinent part:

> [a]lternatives located south of the mountains would pass through Community land.  Because the Community has not granted permission to develop alternatives on its land, there is no prudent and feasible alternative to avoid use of the mountains.  Placing an alternative even farther south of the Community land [i.e., outside of the Study Area] would not satisfy the purpose and need of the freeway.  Therefore, using a portion of the mountains is the only build action available.

ROD at 36-37;

114.    Defendants' 4(f) determination is flawed for a number of significant reasons;

115.    There are a number of alternatives that are both "feasible" and "prudent" that avoid South Mountain and that are not on Community land;

116.    Even under NEPA, however, the agency is obligated to "rigorously explore and objectively evaluate all reasonable alternatives. . . includ[ing] reasonable alternatives not within the jurisdiction of the lead agency."  40 C.F.R. § 1502.14;

117.    As the Gila River Indian Community pointed out in its comments to the FEIS, "[t]he unavailability of an on-Reservation route does not excuse ADOT's failure to study in detail a South Mountain avoidance alternative. . ." ROD Vol. II at A24; *see, also, e.g.*, "Forty Most Asked Questions Concerning CEQ's NEPA Regulations" at 2a ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.").;

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

118.    Plaintiffs' traffic engineer offered a number of viable, feasible, and prudent alternatives that would have avoided South Mountain.  Some were, however, summarily rejected by Defendants because they might have had some impact, even if minimal, on Community land.  For example according to Plaintiffs' Traffic Engineer:

> [t]he 4th paragraph of the response states that "Extending Pecos Road to 51st Avenue would not be feasible because a portion would be located on Gila River Indian Community land, and the Gila River Indian Community has not provided permission to construct a facility on its land."  Similarly to the segment involving arterial improvements along 51st Avenue, the option of constructing an arterial extension of Pecos Road was not presented to the Community and the public, thus depriving the Community of the opportunity to evaluate this option in comparison to the 8-lane freeway option.  The Community did not have the opportunity to make an informed decision on this alternative that did not affect [South Mountain].  This is critical not only because of NEPA requirements but the requirements of Section 4(f) of the Transportation Act.

ROD Vol. II at A133;

119.    The 4(f) regulations specifically require Defendants' 4(f) statement to analyze alternatives to the use of the parkland to determine whether the alternatives are feasible and prudent.  *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1447 (9th Cir. 1984);

120.    In the instant case, there are many alternatives, including the No Build Alternative, that are both feasible and prudent, but that Defendants refused to adequately consider.  *See, Stop H-3 Ass'n*, 740 F.2d at 1457 ("[W]e are not convinced that the No Build alternative must be rejected as imprudent because of traffic congestion and increased commuter delays.");

COMPLAINT

- 33 -

121.    Defendants failure/refusal to consider a number of feasible and prudent alternatives that would have avoided South Mountain is a violation of Section 4(f) of the Transportation Act (and NEPA).

## COUNT 7

### (VIOLATION OF SECTION 4(F)(2) OF THE TRANSPORTATION ACT)

### Defendants Failed to Undertake "All Possible Planning to Minimize Harm"

122.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

123.    Even if there is no feasible and prudent alternative to the taking of parkland, the Secretary still may not give his approval until there has been "all possible planning to minimize harm."  The Defendants can approve a transportation project that uses Section 4(f) property only if "the program or project includes all possible planning to minimize harm . . ." 49 U.S.C. § 1653(f); 49 U.S.C. § 303(c);

124.    Defendants, however, largely put off planning to minimize harm until some future date.  ROD at 46-47 (Table 3);

125.    The promise of future planning and engaging other entities does not meet the agency's statutory obligation.  This, in-and-of-itself, renders the Section 4(f) Determination invalid. i.e., agency action was arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with law;

126.    It is, however, also significant that the project is only contemplated at a 15%-level design.  To avoid the type of inadequate mitigation demonstrated above, it is well

COMPLAINT                                      - 34 -

established that planning/design of the project must be substantially complete before the

agency can issue a Section 4(f) Determination;

127.    In other words:

the planning/design of any project must be substantially complete before the
agency can meet its Section 4(f) obligations.  To clarify this issue, [t]he "all
possible planning" prong of the analysis cannot be met until a project's design
is complete.  If all possible planning to minimize harm to the Section 4(f)
property has not been completed before the Secretary's approval of the project,
the Section 4(f) evaluation is invalid because, absent a finalized plan, it is hard
to see how the Department could make a meaningful evaluation of harm.

*Defenders of Wildlife v. North Carolina Dept. of Transp*. 762 F.3d 374, 399 (4th Cir. 2014);

*D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C. Cir. 1971)

(same); *Monroe County Conservation Council v. Volpe*, 472 F.2d at 701;

128.    At the same time as the DEIS publication, a "study team" submitted the Initial

Location/Design Concept Report (L/DCR) to ADOT.  The design plans included in the

Initial L/DCR represented approximately 15%-level design plans for the Freeway.  The Final

L/DCR was going to be made available to the public sometime after the issuance of the

ROD;

129.    With such a low level of design in place it is impossible to adequately analyze

impacts and/or to adequately discuss mitigation measures under NEPA – it is not only

impossible, but it is legally deficient for purposes of concluding that the agency has

undertaken "all possible planning to minimize harm" under Section 4(f) of the

Transportation Act.

COMPLAINT                                      - 35 -

## COUNT 8

### (VIOLATION OF SECTION 4(F) OF THE TRANSPORTATION ACT)

### Defendants Failed to Adequately Consider the "Constructive Use" of 4(f) Resources

130.     Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

131.     While the Defendants identify resources afforded protection under Section 4(f) within the Study Area, they determine, with virtually no substantive analysis, but only conclusory statements, that no constructive uses of these resources would occur;

132.     This violates the requirements of Section 4(f);

133.     The standards for determining whether a "constructive use" of resources will occur are outlined in § 774.15.  Specifically, a constructive use occurs when:

> [T]he transportation project does not incorporate land from Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the property are substantially diminished.

134.     With regard to the current project, Defendants identified multiple Section 4(f) resources in relation to the project, including: (a) at least 17 public parks, including SMPP, Sec. 4(f) Analysis at 5-13, Figure 5-7; (b) at least 7 recreation trails or trail systems, Sec. 4(f) Analysis at 5-9, Figure 5-5; (c) at least 12 public school recreational facilities (some less than 100 feet from the freeway), *see* Sec. 4(f) Analysis at 5-11, Table 5-6; and (d) at least 8 properties eligible for inclusion on the National Register of Historic Places in addition to SMPP, *see* Sec. 4(f) Analysis at 5-7, Figure 5-4;

COMPLAINT                                          - 36 -

135.    With regard to each of these 4(f) resources, Defendants simply conclude, without adequate analysis, that none of the action alternatives or options would result in the direct or constructive use of these resources;

136.    Moreover, without an appropriate "constructive use" analysis, Defendants cannot consider avoidance alternatives and/or undertake all possible planning to minimize harm as otherwise required by Section 4(f);

## COUNT 9

### (VIOLATION OF NEPA)
### Defendants Failed to Adequately Consider the Freeway's Impact on Children's Health

137.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

138.    Under NEPA, Defendants must "[f]ully consider the impacts of [its proposal] on the physical, biological, social, and economic impacts of the human environment."  40 C.F.R. § 1508.14; *see also, e.g. Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 771, 103 S.Ct. 1556, 1560 (1983) ("NEPA requires agencies to consider effects on health.");

139.    Executive Order 13112, 64 Fed. Reg. 6183 (1999), on "Protection of Children from Environmental Health Risks and Safety Risk" requires, in part, that agencies make it a "high priority to identify and assess environmental health risks and safety risks that may disproportionately affect children;"

140.    Defendants failed to adequately address potential health impacts on children.

COMPLAINT                                          - 37 -

141.   Defendants assert that they are not obligated to consider health impacts of the Freeway on children.  ROD Vol. II at A13.

142.   According to the U.S. EPA:

[t]he conclusion in the Final EIS that children are inherently accounted for in the analyses conducted for the population as a whole does not meet the intent of Executive Order 13045 on Children's Health and Safety.  The order directs that each federal agency shall make it a high priority to identify and assess environmental health and safety risks that may disproportionately affect children, and shall ensure that its policies, programs, activities and standards address these risks. . . Additionally, based on current EPA policy and guidance, an analysis of impacts to children's health should be included in a NEPA analysis if there is a possibility of disproportionate impacts on children related to the proposed action.

Many studies have now shown that people who live, work, or attend school near major roads have an increased incidence and severity of health problems that may be related to air pollution from roadway traffic.  Further, reviews of the literature have concluded that near-roadway traffic emissions may not only trigger and exacerbate asthma symptoms, but also contribute to the development of asthma in children.  As such, the construction of a new 8-lane freeway with diesel truck volumes of up to 17,000 per day in an area with a large population of children constitutes a need to analyze, disclose, and mitigate impacts to children.

ROD, Vol. II at A13-A14;

143.   Defendants do not correct or substantively address any of these issues in the ROD, they simply attempt to justify the findings in the FEIS;

144.   According to Defendants, "[t]he project itself will affect all near-road populations equally; it does not include elements that would lead to higher air pollutant concentrations near children compared with other receptors. . ."  ROD Vol. II at A13;

145.   This is not simply a case of a freeway being sited near a school.  This Freeway will directly impact the following schools with an estimated daily student population of over

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

15,000 children (distance from the center of freeway):  (1) Kyrene de la Estrella (0.2 mi.);

(2) Kyrene de los Lagos (0.1 mi.); (3) Kyrene del Milenio  (0.5 mi.); (4) Kyrene Akimel A-

al  (0.2 mi.); (5) Desert Vista High School  (0.4); (6) Keystone Montessori (0.2 mi.); (7)

Summit School of Ahwatukee  (0.6 mi.); (8) Horizon Community Learning Center (0.4 mi.);

(9) St. John Bosco Interparish Catholic School (0.5 mi.); (10) Betty Fairfax High School (0.1

mi.);  (11) Cheatham Elementary School (0.4 mi); (12) Country Gardens Charter School (0.5

mi.); (13) Sunridge Elementary School (0.4 mi.); (14) Western Valley Middle School (0.4

mi.); (15) Kyrene de la Sierra  (0.2 mi.); (16) Kings Ridge Preparatory Academy (0.7 mi.);

(17) Western Valley Elementary School (0.4 mi.);

146.    Plaintiffs' public health expert reached the same conclusion as the U.S. EPA;

147.    Defendants failed to adequately address potential health impacts on children.

This is a violation of NEPA.  It is also contrary to the mandate of Executive Order 13112, 64

Fed. Reg. 6183 (1999), on "Protection of Children from Environmental Health Risks and

Safety Risk;"

148.    Defendants' failure to adequately consider the health impacts on children (and

others) was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance

with law.  *See, Oregon Nat. Res. Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) ("If an

agency fails to consider an important aspect of a problem . . . its action is arbitrary and

capricious.");

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

149.    Defendants' failure to provide the public with information regarding the potential health impacts on children (and others) was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law.

150.    The FEIS fails to provide a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Center for Biological Diversity*, 349 F.3d at 1166.   The decision to approve this project was neither "fully informed nor well-considered." *See, Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

## **COUNT 10**

### **(VIOLATION OF NEPA)**

**Defendants Failed to Adequately Consider the Impacts of Mobile Source Air Toxics ("MSATs")**

151.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

152.    Defendants' NEPA documents failed to provide an accurate analysis and/or meaningful discussion of near-roadway MSAT emissions;

153.    An accurate analysis/discussion of near-roadway MSAT emissions is critical in determining impacts of the Freeway on human health and the environment.

154.    As the U.S. EPA pointed:

[w]hile we appreciate the expanded discussion of MSATs in the Final EIS, we have continuing concerns about the characterization of near-roadway emissions directly adjacent to the new freeway corridor.  On page 4-79, the Final EIS states that total MSAT emissions are estimated to decline by as much as 91 percent in the study area; however, this is the case only because the document presents an estimated value of MSAT emissions that combines the impact of the new freeway alignment with emissions from the adjacent, and existing, I-10

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

freeway, as well as other roadways in the area.  This methodology does not provide the information needed to characterize the MSAT emissions anticipated solely along the new freeway corridor.

The carbon monoxide and PM10 analyses indicate that concentrations of criteria pollutants along the new freeway corridor will increase relative to current levels, which suggest that MSAT emissions along the corridor would increase as well . . . Therefore, the conclusion that MSAT emissions will decrease by as much as 91 percent pertains only to the overall study area, and does not apply to the potential impacts that may be experienced directly adjacent to the project corridor.  A refinement to the existing discussion, by limiting the scope of analysis to the near-roadway corridor, would allow for conclusions to be made about possible site-specific increases in emissions. Specifically, what impacts will receptors experience directly adjacent to the new roadway and how does this compare with impacts they may experience currently, in the absence of an adjacent high-volume freeway? . . .

In addition to recommending an updated discussion of near-road health effects in the ROD, EPA is also providing the attached additional information for FHWA and ADOT to consider when discussing and analyzing uncertainty, risk comparison, and literature sources associated with the health effects of MSATs.

ROD Vol. II at A8-A9;

155.    Defendants' failure to adequately consider near-roadway MSAT emissions was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law. *See, Oregon Nat. Res. Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) ("If an agency fails to consider an important aspect of a problem . . . its action is arbitrary and capricious.");

156.    Defendants' failure to provide the public with information regarding the impacts of near-roadway MSAT emissions was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law.

157.    The FEIS fails to provide a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Center for Biological Diversity*, 349

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

F.3d at 1166.   The decision to approve this project was neither "fully informed nor well-considered."   *See, Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

## COUNT 11

## (VIOLATION OF NEPA)

**Defendants Failed to Adequately Consider the Impacts of Truck Traffic**

158.   Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

159.   Potential increases in heavy-truck traffic would result in significant increases to criteria pollutant and MSAT emissions;

160.   Defendants create a presumption (outside of the NEPA context) that 10% of the traffic on the Freeway will be trucks;

161.   This presumption, along with the potential impacts arising from the likelihood of a greater number of trucks than reflected in Defendants' estimate, should have been discussed and disclosed in the direct and cumulative impacts sections of the FEIS;

162.   With regard to Defendants' assignment of 10% truck traffic – without consideration of the location and/or nature of the Freeway – Plaintiffs' traffic engineer pointed out in his comments on the FEIS, in part, that:

> . . . with the information available in the FEIS, the total 2035 traffic on the SMF would be about 132,000 vehicles per day between 24th Street and 40[th] Street, whereas the traffic would be 120,000 vehicles per day between 40th Street and I-10 (Maricopa).   If we were to apply the 10% truck traffic assumption, we would have about 13,200 trucks per day between 24th Street and 40th Street and about 12,000 trucks per day between 40th Street and I-10 (Maricopa).   Thus the FIES suggests, and one would conclude, that the residential area served by 40th Street interchange would result in a net increase in truck traffic of about 1,200

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

per day.  (the term "net" is used because some trucks would get off and some trucks would get on the freeway at the interchange.).  Does the MAG model indicate this level of truck activity at the 40th Street interchange?  This level of activity at an interchange serving primarily a residential area is very unlikely, yet that would be the conclusion if the reader were to rely on the "percentage" calculation.

ROD Vol. II at A165-A166;

163.   Defendants' failure to provide an adequate analysis/discussion/estimation of truck traffic is a violation of NEPA;

164.   An inaccurate (or inexplicable) estimate of truck traffic also makes it impossible to accurately account for, *inter alia*, emissions of criteria pollutants as well as MSATs;

165.   Defendants' failure to adequately consider the level and nature of truck traffic on the Freeway and/or to assign a 10% figure outside of the NEPA context, was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law.  *See, Oregon Nat. Res. Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) ("If an agency fails to consider an important aspect of a problem . . . its action is arbitrary and capricious.");

166.   Defendants' failure to provide the public with information regarding the true nature and extent of truck traffic on the Freeway was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law;

167.   The FEIS fails to provide a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Center for Biological Diversity*, 349

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

1    F.3d at 1166.   The decision to approve this project was neither "fully informed nor well-

2    considered."  *See, Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

3

4                                **COUNT 12**

5                            **(VIOLATION OF NEPA)**

6    **Defendants Failed to Adequately Consider Impacts Associated with the Transport of Hazardous Materials**

7

8            168.    Plaintiffs reallege and incorporate by this reference the allegations contained

9    above as though fully set forth herein;

10           169.    Defendants aver that they do not have to consider any impacts associated with

11   the transport of hazardous materials because they are not "reasonably foreseeable."  ROD

12   Vol. II at A280;

13

14           170.    Defendants estimate that 65,000 to 70,000 trucks would use the Eastern

15   Section of the Freeway on a daily basis.  This includes approximately 14,000 heavy trucks

16   per day.  ROD Vol. II at A144-A145;[2]

17           171.    Defendants do no analysis of how many of these trucks might be transporting

18   hazardous materials;

19

20           172.    Tank farms and industrial uses dominate the area around 59th Avenue, the

21   selected point of the Western Section of the Study Area.  *See*, FEIS at 4-164.  According to

22   ───────────────
23           [2] As discussed, *supra*, the estimates of truck traffic are not supported by the record.
     MAG/ADOT simply assume that 10% of the traffic would be trucks based on "their
24   experience with other regional freeways."  According to Plaintiffs' traffic engineer, however,
     "ADOT truck traffic counts indicate that many segments along existing freeways in the
25   region have substantially more than 10%, while some others have less.  Despite requesting
     additional truck traffic information in the DEIS comments, no additional information is
26   presented in the FEIS."  ROD Vol. II at A165.

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

the City of Phoenix, for example, a tank farm located at 51st Avenue and Van Buren Street "serves as the primary distribution point for petroleum products in the Phoenix area. . . Large quantities of products, primarily flammable and combustible liquids, are stored at this location and distributed to service stations and other users by tank truck . . ."

173.    Given the nature of the air shed created by South Mountain and the populated areas adjacent to the Freeway on the Eastern Section, an accident involving a hazardous material transport could have catastrophic results;

174.    The prospect of a traffic accident involving a truck carrying a hazardous material is neither so "remote" nor "highly speculative" as to be beyond NEPA's requirements;

175.    Defendants' failure/refusal to adequately consider impacts associated with the transport of hazardous materials on the Freeway was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law.  *See, Oregon Nat. Res. Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) ("If an agency fails to consider an important aspect of a problem . . . its action is arbitrary and capricious.");

176.    Defendants' failure to provide the public with information regarding impacts associated with the transportation of hazardous materials on the Freeway was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law;

177.    The FEIS fails to provide a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Center for Biological Diversity*, 349

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

F.3d at 1166. The decision to approve this project was neither "fully informed nor well-considered." *See, Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988);

## COUNT 13

### (VIOLATION OF NEPA)

**Defendants Failed to Adequately Consider Impacts on the Arterial Street System and Local Traffic Patterns Near the Proposed Interchanges Along the Freeway**

178. Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

179. Defendants' NEPA documents fail to include an adequate analysis of traffic impacts on arterials in the vicinity of the proposed interchanges and impacts on local access;

180. For example, the Freeway removes certain current access points like 32nd Street to Pecos Road and 27th Avenue to Pecos Road. Removal and alteration of access points to the Freeway will have a significant impact on local traffic patterns that should have been addressed more thoroughly in the DEIS/FEIS. *See*, FEIS Vol. III at B459-B465.

181. Defendants' failure to adequately consider impacts on arterials and local access in the vicinity of proposed interchanges was arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law. *See, Oregon Nat. Res. Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) ("If an agency fails to consider an important aspect of a problem . . . its action is arbitrary and capricious.");

## COUNT 14

### (VIOLATION OF NEPA)

**Defendants Failed to Adequately Consider Mitigation Measures**

COMPLAINT

- 46 -

182.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

183.    Defendants are required to provide an adequate discussion of, *inter alia*, steps that can be taken to mitigate adverse environmental consequences.  In other words:

> [t]he requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the Act and, more expressly, from CEQ's implementing regulations.   . . . omission of a reasonably complete discussion of possible mitigation measures would undermine the "action-forcing" function of NEPA. .

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-352, 109 S.Ct. 1835, 1847 (1989);

184.    "Mitigation must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated. . . A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."  *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998);

185.    Defendants' discussion of mitigation measures is improperly postponed until the future and/or includes a "mere listing;"

186.    Even though the failure to discuss substantive mitigation measures regarding one significant aspect of the project would violate the NEPA process – in the instant case, more often than not, any substantive discussion of mitigation is put off until some future time.  See, ROD at 38-47 (Table 3);

187.    Defendants cannot put off the requisite reasonably thorough discussion of mitigation measures for a later date.  "An Environmental Impact Statement cannot . . . omit a

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

reasonably thorough discussion of mitigation measures because to do so would undermine the action-forcing goals of the National Environmental Policy Act." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 ((9th Cir. 1997); *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir. 1990) ("NEPA requires consideration of the potential impact of an action before the action takes place.");

188.    Again, on this basis alone, agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law.

## COUNT 15

### (VIOLATION OF NEPA)

### Defendants Failed/Refused to Adequately Consider Mitigation Measures for "Cumulative" and "Secondary" Impacts

189.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

190.    Defendants assert with, no legal support, that "[d]isclosure of secondary and cumulative impacts does not require ADOT to propose and implement mitigation measures to address such impacts. . ."  FEIS at 4-188;

191.    This assertion is directly contrary to Defendants' obligation to consider mitigation of environmental impacts.  *E.g., Robertson*, 490 U.S. at 358, 109 S.Ct. at 1850, *citing* 40 C.F.R. § 1502.16(b) (Indirect effects) ("NEPA and CEQ regulations require detailed analysis of both on-site and off-site mitigation measures."); 40 C.F.R. § 1502.16(h) (Requiring discussion of the "means to mitigate adverse environmental impacts" in EIS).

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

1  Even applicable FHWA regulations require FHWA to incorporate "[m]easures necessary to

2  mitigate adverse impacts. . ." 23 C.F.R. § 771.105(d);

3

4      192.    The law does not carve out an exception for "cumulative," "secondary," or

5  "indirect" impacts.  This is a question of law subject to *de novo* review;

6

## COUNT 16

7

### (VIOLATION OF NEPA)

8

### Defendants Failed to Adequately Consider Mitigation Measures for Wildlife Corridors/Connectivity

9

10      193.    Plaintiffs reallege and incorporate by this reference the allegations contained

11  above as though fully set forth herein;

12

13      194.    As pointed out by the EPA:

14      despite the anticipated impacts of the project to wildlife movement, little has
        been proposed in the Final EIS to address and mitigate for the construction of
15      this significant new barrier to wildlife connectivity, with the exception of a few
        multiuse crossings and culverts.  In response to comments on the Draft EIS,
16      FHWA and ADOT suggest that the corridor will only become more degraded
        as the surrounding area develops, and that it is not the responsibility of ADOT
17      to mitigate for impacts caused by these future unrelated actions.  However, as
        is made clear in local general plans, the future development of the surrounding
18      area is not an unrelated action and is very much dependent on the construction
        of the proposed project to facilitate access into these core development areas.
19      As such, EPA continues to recommend that FHWA and ADOT identify
        measures in the ROD beyond standard freeway mitigation to protect and
20      restore this important wildlife linkage.

21

22  ROD Vol. II at A16-A17;

23      195.    The Arizona Game and Fish Department (the "Department") was similarly

24

25  critical of how Defendants' responded to wildlife connectivity and other wildlife related

26  issues.  ROD Vol. II at A41- A50;

COMPLAINT                              - 49 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

196.    For example, according to the Department:

[t]he Department has provided formal comments on this project from 2001 to present.  The FEIS fails to incorporate updated, relevant information related to wildlife connectivity that the Department has provided  . . .   the most recent, validated, and high quality information that we provided [should have been] incorporated into the analysis, design and development of mitigations. Furthermore the Department requests that indirect and cumulative impacts be included when considering appropriate mitigation.

ROD Vol. II at A42;

197.    Defendants improperly defer any substantive discussion of mitigation of wildlife corridors/connectivity for some later date and refuse to consider mitigation of cumulative, direct and/or indirect impacts.  *See, e.g.,* ROD at 42 (Table 3) (". . . ADOT will coordinate with USFWS, AGFD and the Community's Department of Environmental quality during the design phase regarding the location and design of wildlife-sensitive roadway structures."); *Id.* ("For drainage structures, such as culverts located in potential wildlife movement corridors, ADOT will coordinate, AGFD . . . during the design phase regarding the location and design of wildlife-sensitive roadway structures . . ."). Agency action was arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with law.

198.    Again, on this basis alone, agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law.

## COUNT 17

### (VIOLATION OF CAA/NEPA)

### Defendants Failed to Adequately Consider Impacts of Air Emissions from the Freeway and "Conformity" with the Requirements of the Clean Air Act

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

199.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

200.    Pursuant to 40 C.F.R. 93.123(b)(1)(i), quantitative hot spot analyses methods must be used for, *inter alia*, "new or expanded highway projects that have a significant increase in diesel levels";

201.    The demonstrations required by 40 C.F.R. 93.116 (Localized CO, PM10, and PM2.5 violations) must be based on quantitative analysis using the applicable air quality models, data bases, and other requirements specified in 40 CFR Part 51, Appendix W.

202.    According to 40 CFR 93.116, any FHWA project "must not cause or contribute to any new localized CO or PM10 violations or increase the frequency or severity of any existing CO or PM10 violations in CO and PM10 nonattainment and maintenance areas;"

203.    ADOT failed to adequately evaluate and comply with federal mandates of conformity by not conducting proper or technically adequate air quality/hot spot modeling;

204.    The data sets used were not relevant to evaluate the highway's impact to local or downwind communities and air shed pollutant loading;

205.    Meteorological data and most atmospheric data used in the ADOT modeling had no relevance to the Freeway;

206.    For example, ADOT's data: shows no mountain influence, ADOT failed to consider the diurnal flows of the valley and the influence of the South Mountain range on atmospheric air pollutants; there is neither adequate sampling nor monitoring, ADOT takes

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

temperature/inversion readings that should be conducted in the same place, but are instead miles apart;

207.    ADOT ignores conformity requirements vis-a-vis ozone problems, particulates (the asserted PM10 and CO hot spot analysis is taken outside the "Study Area"), and public health issues identified in the State Implementation Plan ("SIP");

208.    ADOT has not shown any supporting technical information, analytical proof or included the correct use of air quality and air shed databases in their air quality models;

209.    Under the SIP an ozone non-attainment area cannot be adversely impacted by an up-wind source, including a new freeway;

210.    Defendants failed to evaluate ozone non-attainment areas either for SIP management or with regard to the potential for impacts from the Freeway;

211.    Air Quality modeling outputs relied on by ADOT do not adequately address potential impacts to Ahwatukee or the Community or reflect ADOT's failure to comply with transportation conformity and the legal and enforceable SIP;

212.    Air Quality modeling outputs relied on by ADOT do not adequately address the potential for Freeway impacts on down-wind ozone non-attainment communities including, Tempe, Mesa, Gilbert, Fountain Hills, Apache Junction and Pinal County;

213.    The influence of South Mountain will not only contain but also increase pollutant concentrations and will worsen local and transport pollutants;

214.    The areas to the south and east of I-10 and the proposed 202 route will experience the transport of high concentrations of ozone precursors that will be compounded

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

by diurnal winds reducing timely attainment of nonattainment areas and increasing ozone concentrations in downwind locations of the new 202 highway, including in the identified non-attainment area in northern Pinal County, hence violating MAG Ozone SIP.

215.   Agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law;

## COUNT 18

### (VIOLATION OF NEPA)
**Defendants Failed to Adequately Respond to Comments**

216.   Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

217.   According to 40 C.F.R. § 1503.4, an agency must respond by one or more of the means listed, stating its response in the final statement: (1) modify alternatives including the proposed action; (2) develop and evaluate alternatives not previously given serious consideration by the agency; (3) supplement, improve, or modify its analyses; (4) make factual corrections; (5) explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the  agency's position;

218.   Defendants failed to adequately respond to the comments submitted by Plaintiffs;

219.   Agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law;

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

220.   Defendants were required, *inter alia*, to "disclose responsible opposing scientific opinion and indicate its response in the text of the final statement itself." *Center for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1169 (9th Cir. 2003);

221.   The generally inadequate responses to Plaintiffs' expert comments were relegated to an appendix and not included in the "text of the final statement itself." *See, Id*; *Friends of the Earth v. Hall*, 693 F.Supp. 904, 924-25, 934 (W.D. Wash. 1988) (responsive analysis to comments of key agencies and respected scientists should be in the body of the FEIS, not in a response to comments section of the appendix);

222.   "While the agency is not required to publish each individual comment in the final statement . . . 40 C.F.R. § 1503.4(a), the regulations clearly state that the agency must disclose responsible opposing scientific opinion and indicate its response in the text of the final statement itself.  40 C.F.R. § 1502.9(b). The mere presence of the information in the record alone does not cure the deficiency."  *Center for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1169 (9th Cir. 2003);

223.   Again, agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law;

## COUNT 19

### (VIOLATION OF NEPA)

### Defendants Failed to Adequately Consider Impacts Associated with the Potential Loss of Wells in the Right-Of-Way

224.   Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

COMPLAINT                                     - 54 -

225.   The Lakewood Community Association relies on wells that may be in the right-of-way to feed its community lakes;

226.   These lakes will likely be impacted if the Freeway is built;

227.   Lakewood's wells were identified as being in the right-of-way in Defendants' NEPA documents;

228.   Lakewood is now being led to believe that this determination will not be made until later in the design phase;

229.   The golf course for the Foothills Community Association also relies on a well(s) in the Pecos Road right-of-way that may be impacted by the Freeway;

230.   Defendants provide no adequate analysis with regard to impact on Plaintiffs' wells;

231.   Defendants provide no analysis of mitigation measures – no analysis of any source of replacement water for wells, either city water or new wells;

232.   Under 40 C.F.R. § 1502.24, agencies are required to "insure the professional integrity, including scientific integrity, of the discussions and analyses in the environmental impact statements. . .";

233.   In addressing the potential for the destruction of the wells in/near the right-of-way and the possibility of mitigation, defendants rely on incomplete, inaccurate, and outdated information;

COMPLAINT                                      - 55 -

234.    Defendants further fail to adequately consider the cumulative, secondary and indirect effects of their proposal to replace well water with potable water from the City of Phoenix;

235.    The City of Phoenix essentially relies on surface waters from the Colorado River via the Central Arizona Project;

236.    Even a superficial reading of available literature shows that demand for water in the Phoenix area will eventually outpace water supply.  *See,* Rod Vol. II at A199;

237.    Defendants fail to consider the social, economic and other impacts vis-à-vis competing demand for water in the future;

238.    Agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law;

## COUNT 20

### (VIOLATION OF NEPA)

**Defendants Failed to Adequately Consider Cumulative, Direct and Indirect Impacts**

239.    Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein;

240.    The FEIS fails to sufficiently identify and analyze cumulative impacts of the project, including impacts stemming from past, present and reasonably foreseeable future actions in the Study Area;

241.     Federal regulations define cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other

COMPLAINT                                    - 56 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions" 40 C.F.R. § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7;

242.   The FEIS devotes a scant few pages to addressing the cumulative impacts of the project on the affected environment, only briefly discussing cumulative impacts related to biological resources, water, cultural resources, land use, environmental justice, visual resources, recreational lands, noise and air quality;

243.   The discussion in the FEIS is not sufficient under NEPA, which requires that the Departments' analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-Moak Tribe of Western Shoshone v. DOI*, 608 F.3d 592, 603 (9th Cir. 2010) (*quoting Lands Council v. Powell*, 395 F.3d 1019, 1027, 1028 (9th Cir. 2005);

244.   The FEIS identifies only a handful of activity types that the Defendants believe could contribute to cumulative impacts, including highway projects, planned mass transit in the Study Area, other major infrastructure projects, like utility expansions, and "other general development patterns."  FEIS at 4-183.  Of these activities, the chief type of cumulative impact that is discussed in the document is the ongoing, planned and permitted residential and commercial development with the Study Area.  *Id;*

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B ▪ TEMPE, AZ 85283
TELEPHONE (480) 838-9300 ▪ FACSIMILE (480) 838-9433
howard@shankerlaw.net

245.    However, the FEIS discusses the location, scope and effects of past, present and future projects in the Study Area only in generalities, without offering any specific analysis of how the developments actually interact with the affected environment to result in a cumulative effect. This sort of vague discussion of cumulative impacts can be found in virtually every part of the cumulative effects section.  This is inconsistent with the requirements of NEPA

246.    The Defendants' description of past, present and reasonably foreseeable future developments and projects in the Study Area which are based on mere generalities is insufficient to permit adequate review of their cumulative impact under NEPA.  *See, e.g., City of Carmel-by-the-Sea v. USDOT*, 123 F.3d 1142, 1160-61 (9th Cir. 1997) (general references to development projects and ongoing urbanization was insufficient for a proper cumulative effects analysis under NEPA); *see also Natural Resources Defense Council, Inc. v. Hodel*, 275 U.S. App. D.C. 69, 865 F.2d 288, 299 (D.C. Cir. 1988) ("These perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

247.    Agency action was arbitrary, capricious, an abuse of discretion and/or not otherwise in accordance with law;

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that judgment be entered in favor of the plaintiffs and against Defendants as follows:

COMPLAINT

- 58 -

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net

1.      Declaratory Judgment finding that Defendants' actions were: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and/or (2) without observance of procedure required by law, as mandated by the APA.   Further declaratory relief finding that:

(a)      The FEIS/ROD was inadequate as a matter of law;

(b)      The FHWA/ADOT violated NEPA in approving this project;

2.      A Mandatory Injunction requiring the Defendants to:

(a)      Stay all action in furtherance of this project until the Defendants can comply with all applicable laws and regulations;

3.      Hold that the FHWA action in approving the project was unlawful and set it aside.  *See, e.g.,* APA, 5 U.S.C. § 706.

4.      Award to plaintiffs their costs and reasonable attorneys' fees

5.      Award such other and further relief as the Court deems just and equitable.

DATED this 18th day of May, 2015.

**THE SHANKER LAW FIRM, PLC.**

By:  */s/ Howard M. Shanker*
     Howard M. Shanker
     700 East Baseline Road, Bldg. B
     Tempe, Arizona 85283
     Phone: (480) 838-9300
     Facsimile: (480) 838-9433
     howard@shankerlaw.net

     *Attorneys for Plaintiffs*

THE SHANKER LAW FIRM, PLC.
700 EAST BASELINE ROAD, BLDG. B • TEMPE, AZ 85283
TELEPHONE (480) 838-9300 • FACSIMILE (480) 838-9433
howard@shankerlaw.net